Denzil W. NOLAN, Sr., et al., Plaintiffs,

v.

Robert N. NOLAN, Defendant.

Civ. A. Nos. 81–0028–P(H), 81–0033–P(H).

United States District Court,
S.D. West Virginia,
Parkersburg Division.

April 14, 1983.

J. David Cecil, Cecil, Pearson & Barth, Charleston, W.Va., Daniel E. Whiteley, Jr., Miller & Whiteley, Cincinnati, Ohio, for plaintiffs.

Paul T. Theisen, Theisen, Brock, Frye, Erb & Leeper, Marietta, Ohio, Robert L.

Bays, Morris & Ruley, Parkersburg, W.Va., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

### I. *Background*

These two civil actions were consolidated for trial. Both actions arise from a June 2, 1980, accident between a pickup truck operated by Robert N. Nolan and one operated by Denzil W. Nolan, Sr.[1] Denzil Nolan filed Civil Action No. 81–0028–P(H) alleging that Robert, while passing Denzil's vehicle on West Virginia Route 31 near Williamstown, intentionally rammed his truck against Denzil's in an attempt to run Denzil off the road. Robert Nolan counterclaimed asserting that the accident was proximately caused by the negligent, or in the alternative, the intentional, reckless and willful manner in which Denzil Nolan operated his truck. Mary K. Nolan, Robert's wife, then brought Civil Action No. 81–0033–P(H), under the same theory of liability as her husband's counterclaim, for loss of consortium damages.[2] Both cases were filed under this Court's diversity jurisdiction. 28 U.S.C. § 1332(a)(1).[3] After a three-day trial the jury found that neither Robert Nolan nor Denzil Nolan were guilty of an intentional tort. On Robert Nolan's counterclaim the jury apportioned twenty percent of the total negligence to Robert Nolan and the remaining eighty percent to Denzil Nolan. The jury found Robert Nolan's total damages to be $1,920.78. The Court entered judgment accordingly. Plaintiffs now move this Court for a judgment notwithstanding the verdict or, in the alternative, for a new trial.

---

1. The two principal litigants' common surname is not a coincidence. Robert and Denzil Nolan are brothers and former business partners in a construction company. As the result of the brothers' differing views on how to run that business, Denzil brought an action in state court to effect the dissolution of that partnership. Those proceedings involved rather bitter disputes between Robert and Denzil which, when combined with certain personality conflicts, created a rift between the two to the point where they now no longer even speak to each other. That a great deal of animosity exists between Robert and Denzil was noted by several witnesses during the trial of this action, including the brothers Nolan themselves.

2. Mary K. Nolan voluntarily dismissed her action pursuant to *Rule* 41(a)(1) on the first day of trial.

3. Robert and Mary K. Nolan are citizens of Ohio; Denzil and Dorothy Nolan are West Virginia citizens.

## II. *Judgment Notwithstanding the Verdict*

■ The Plaintiffs' motion for judgment *non obstante veredicto* is procedurally infirm. Only a party who has moved for a directed verdict at the conclusion of the opposing party's case-in-chief can successfully move for a judgment n.o.v. *See Rule* 50(b); *Miller v. Premier Corp.,* 608 F.2d 973 (4th Cir.1979); *Aetna Casualty & Surety Co. v. Yeatts,* 122 F.2d 350 (4th Cir.1941); *Virginia-Carolina Tie & Wood Co. v. Dunbar,* 106 F.2d 383 (4th Cir.1939). In explaining this rule the Fourth Circuit in *Miller* stated that

> "[t]he requirement of a proper directed verdict motion as foundation for a motion for judgment n.o.v. under Fed.R.Civ.P. 50(b) is not a mere technicality; it serves vitally important interests in the fair conduct of litigation."

608 F.2d at 979 n. 3.[4]

One such important interest was articulated in *Mutual Benefit Health & Accident Association v. Thomas,* 123 F.2d 353, 355 (8th Cir.1941):

> "To ask the court to enter a judgment, contrary to a general verdict of the jury where no motion for a directed verdict has been interposed, is simply to ask the court to re-examine the facts already tried by the jury, and this the court may not do without violating the Seventh Amendment."

In commenting upon the above quoted language from *Mutual Benefit Health & Accident Association,* Professor Moore writes:

> "There is a better reason for establishing the motion for a directed verdict as a condition precedent to a motion for judgment n.o.v. This is to avoid making a trap of the latter motion. At the time that a motion for a directed verdict is permitted, it remains possible for the party against whom the motion is directed to cure the defects in proof that might otherwise preclude him from taking the case to the jury. A motion for judgment n.o.v. without prior notice of alleged deficiencies of proof, comes too late for the possibility of cure except by way of a complete new trial. The requirement of the motion for a directed verdict is thus in keeping with the spirit of the rules to avoid tactical victories at the expense of substantive interests. [footnote omitted]"

Moore's Federal Practice, Vol. 5A, Section 50.08 at 50–88. Interestingly, this "better reason" of Professor Moore's was the precise rationale employed by the Fourth Circuit in *Virginia-Carolina Tie & Wood Co. v. Dunbar,* 106 F.2d 383, 385 (4th Cir.1939).

■ The result dictated by the foregoing authorities is clear. Inasmuch as Plaintiffs failed to make the appropriate motion at trial for a directed verdict, they have not preserved for post-trial consideration a motion for judgment n.o.v. Therefore, Plaintiffs' motion for judgment n.o.v. is hereby denied.

## III. *Motion for a New Trial*

■ Plaintiffs assert seven separate grounds in support of their motion for a new trial.[5] Only one, that concerning the

---

**4.** It should be pointed out that the court in *Miller* went on to consider the movant's post-trial motions because the record in that case was not clear as to whether the appropriate motion for a directed verdict was made at trial. In reviewing the record the court noted:

> "No written motions were filed. Oral motions for 'dismissal' were made in a colloquy that is too confusing to permit confident assessment. Without exhaustive analysis here it suffices to say that taking into account the confusion caused by the interrelation of the securities law and common law fraud evidence in the entire course of the colloquy between court and counsel, we conclude that

fairness requires consideration of Premier's contentions respecting sufficiency of the evidence."

608 F.2d at 979 n. 3. In contrast, the record here reveals no ambiguity—Plaintiffs made no motion, either orally or in writing, which could in any fashion be construed as a motion for a directed verdict.

**5.** These grounds are:
1. The verdict is contrary to the law.
2. The verdict is contrary to the evidence.
3. The evidence is insufficient to sustain the verdict.

alleged improper contact with a member of the jury, requires discussion.

Plaintiffs have accompanied their post-trial motions with affidavits by Denzil Nolan and his wife, Dorothy. The affidavit of Denzil Nolan states that after the lunch recess on the second day of trial, he was seated with his wife outside the doors of the courtroom when he saw "coming from the elevator the Defendant, Robert Nolan, defense counsel Paul Theisen, and Juror Mr. Columbo; these persons were engaged in conversation as they exited the elevator; continuing their conversation the three persons walked around the hallway and in the direction of the jury room continuing their conversation [sic]." Denzil Nolan also stated that in his affidavit that four to five minutes later these three persons were still engaged in conversation near a water fountain in the hallway leading to the jury room. Denzil Nolan did not hear any of the conversation.

Dorothy Nolan's affidavit mirrors that of Denzil's except that she did not see the three men talking near the water fountain after they had left the elevator.

The affidavits submitted on behalf of the Defendant depict a quite different account of the events.[6] Mr. Theisen explains that he and Mr. Ullman entered the elevator on the first floor and thereupon noticed the presence of Juror Columbo. Theisen initiated no conversation with Columbo, however, Mr. Columbo asked Theisen if he knew a Mr. Riggs of Marietta. Theisen replied that if Columbo was referring to Judge Riggs, he did know him. Columbo then replied that Judge Riggs had taught him business law at Marietta College. Theisen's affidavit states that he had no further conversation with Mr. Columbo.

The Court need not attempt to resolve the factual questions raised by the opposing affidavits because this matter may be disposed of as a matter of procedure.[7] By their own sworn affidavits Plaintiffs have admitted to having observed what they believed to be misconduct by the opposing party and his counsel, yet they failed to alert the Court or object at trial. It is a well-settled rule that under such circumstances the party has waived his right to object. *See Spreckels v. Brown,* 212 U.S. 208, 29 S.Ct. 256, 53 L.Ed. 476 (1909); *Upton v. Harrison,* 68 F.2d 232 (4th Cir.1934) *cert. denied* 292 U.S. 633, 54 S.Ct. 718, 78 L.Ed. 1486; *Bank of the South v. Fort Lauderdale Technical College, Inc.,* 48 F.R.D. 136 (E.D.La.1969); *Morley v. Cran-*

---

4a. Plaintiffs were prejudiced by Defendant's counsel's remarks that Plaintiffs were represented by "out of town counsel." (Which is curious inasmuch as Defendant's counsel told the jury in his opening statement that he resides and practices in Marietta, Ohio. Thus admitting to being guilty not only of the parochial crime of being an "out of town counsel" but also, following Plaintiffs' logic, of the much more serious offense of being from "out of state").

4b. Plaintiffs were prejudiced by Defendant's counsel's remarks that Plaintiffs' expert witness, O.R. Roe, was prejudiced. (Plaintiffs made no objection at trial when these remarks were made).

5. Plaintiffs were prejudiced by Defendant's counsel calling Harry Barnett as a witness. (Mr. Barnett was, and apparently remains, an employee of the father of the foreman of the jury. Mr. Barnett's testimony was not lengthy or substantial. His testimony concerned only the introduction into evidence of a single photograph of the roadway near the Rambler Motel where Robert Nolan allegedly made a "U" turn to follow Plaintiffs).

6. The Court erred in permitting Don White to testify as an expert witness concerning the cause of the accident. (Don White is the Chief of Police in Williamstown, West Virginia. Chief White has investigated "hundreds" of traffic accidents and was the investigating officer of the June 2, 1980 accident).

7. Plaintiffs were prejudiced by contact between Defendant's counsel, Paul T. Theisen, Robert Nolan and Juror James Columbo.

**6.** In opposition to the Plaintiffs' affidavits the Defendant has submitted affidavits by Paul T. Theisen, Robert Nolan, Robert Bays (Theisen's co-counsel) and Dan Ullman (Mr. Ullman was a witness for the defense; he repaired Robert Nolan's truck after the June 2, 1980, accident).

**7.** The Court would note, however, that the account given by Mr. Theisen, accompanied by a mistake by Denzil Nolan as to the identity of the three persons who were engaged in conversation near the water fountain, provides a very credible explanation of the entire affair.

*more Skimobiles,* 67 F.Supp. 812 (D.N.H. 1946); *Kelly v. Gulf Oil Corporation,* 28 F.Supp. 205 (D.Pa.1939) *affirmed* 105 F.2d 1018; *Union Electric Light & Power Co. v. Snyder Estate Co.,* 15 F.Supp. 379 (D.Mo. 1936); *Papernow v. Standard Oil Company of New York,* 228 F. 399 (D.R.I.1915). *See also Adams v. Davis,* 578 S.W.2d 899 (Ky. App.1979); *Henrioulle v. Marin Ventures, Inc.,* 573 P.2d 465, 143 Cal.Rptr. 247, 20 Cal.3d 512 (1978); *Zimmerman v. Witte Transportation Co.,* 259 N.W.2d 260 (Minn. 1977) and other state cases collected at Annotation 62 A.L.R.2d 298 at 309, n. 13 (including *Legg v. Jones,* 126 W.Va. 757, 30 S.E.2d 76 (1944)). The rationale for this rule was aptly stated in one of the first cases to address this question, *Berry v. DeWitt,* 27 F. 723, 724 (Cir.Ct.S.D.N.Y. 1886):

> "[M]isconduct of a juror during the trial, if known to the party at the time of its occurrence, and not made the subject of a motion to the Court, is waived. A party cannot know, during the trial, a fatal objection arising from the misconduct of a juror upon the trial, and keep silence, and take advantage of it in the event of an adverse verdict. He is not permitted to 'speculate upon the chances of a verdict.'"

This reasoning was echoed by the Fourth Circuit (then the Circuit Court of Appeals, Fourth Circuit) in *Upton v. Harrison,* 68 F.2d 232, 233 (4th Cir.1934), "[H]aving been silent when it was his duty to speak, he will 'not be heard to speak when it is his duty to be silent.' *Qui taset consentire viditur.*" [8] Accordingly, this Court will not now entertain Plaintiffs' fatally belated allegations of misconduct.

Having thoroughly considered the Plaintiffs' remaining grounds for a new trial, *see* note 5, *supra,* the Court finds each to be wholly without merit; the Plaintiffs' motion for a new trial is denied.

---

**8.** "He who is silent is supposed to consent."